O'NEIL v. PITTSBURG, C., C. & ST. L. R. CO.

(Circuit Court, W. D. Kentucky. March 18, 1904.)

1. MASTER AND SERVANT—INJURY TO SERVANT—FELLOW SERVANTS.

A flagman employed by a railroad company and stationed at a street crossing, with the company's tracks on either side of him, necessarily assumes the risk incident to crossing such tracks in passing to and from his station, and until he has passed over them after his hours of work

are over he remains a fellow servant with the employés running trains thereon, and cannot recover from the master for an injury due to their negligence.

**2. SAME—CONTRIBUTORY NEGLIGENCE.**

A flagman, injured by an engine while he was crossing the tracks of his employer's road in the dark when leaving his station, *held* chargeable with contributory negligence, which precluded his recovering damages from the railroad company, where he neither stopped before stepping on the track, nor listened for the train, which he had previously seen approaching.

**Action for Personal Injury. On motion by defendant for direction of a verdict.**

This is an action for damages for personal injuries. The plaintiff was a flagman stationed in the midst of the railroad tracks at the intersection of Fourteenth and Rowan streets, in this city. Three or more parallel tracks of the defendant's road ran northwardly along Fourteenth street to the bridge across the Ohio river, a few hundred yards away. Plaintiff usually left his station at 6 p. m., after the local train called the "Dinkey," running between Louisville, Ky., and New Albany, Ind., had "pulled out." Probably thinking this had occurred, at 6 p. m. on the 28th day of November, 1900, plaintiff put away his flag, got his coat, and, his day's work being done, started westwardly across the tracks on that side, on his way home. Some minutes before starting, however, he had seen a freight train on the bridge, coming southwardly towards him, but, apparently forgetting this, he approached the tracks on which the train was moving, and, without stopping or listening, and apparently without looking, though he says it was then too dark to have seen the train if he had looked, and also that a car on an intervening track obscured the view, he stepped upon the second track, and at the instant of doing so was struck by the slowly approaching freight train, and injured.

W. M. Smith, for plaintiff.
C. H. Gibson, for defendant.

EVANS, District Judge (after stating the facts as above). The testimony having been concluded, the defendant has moved the court, upon the whole case, to instruct the jury to find for it, and urges the motion upon three grounds: (1) It insists that the evidence does not show any negligence upon its part to bring it under any obligation to compensate the plaintiff for the injuries sustained; (2) that, even if the defendant was negligent, the plaintiff would not have been injured if he had not contributed to it or brought it on by his own negligence; and (3) that any negligence, if there was any, which caused the injury to the plaintiff, was that of his fellow servants, and therefore did not impose any liability on the defendant. I have examined these contentions as carefully as existing conditions would permit, and will briefly state my conclusions.

I do not doubt that the plaintiff and the engineer and fireman on the engine by which he was hurt were fellow servants. It is quite true that there is conflicting testimony upon several points, such, for example, as whether it was so dark when the plaintiff was injured that he could not see the engine when he went to the track on which it was running, although it may be remarked that when all of the testimony is considered it would be difficult to have much doubt on that point. There was conflict as to whether the engine and tender had been detached from the train before the plaintiff was struck;

also as to whether the so called "Dinkey" train had passed to the north of Rowan street when the injury occurred; also as to whether there was a light on the tender which struck plaintiff, which could have been seen as it approached Rowan street; also as to whether the bell was ringing as it approached that street; also as to whether there were cars standing near Rowan street on what is called the "main" track of the railroad. There may be other points of conflict, and there might be room to doubt as to whether the "Dinkey" train, as it moved out, made a noise so dominant as to drown any made by the incoming freight train or the engine which inflicted the injury, and which was moving with steam shut off. But there is no conflict upon several points: None that the point where plaintiff worked was in the intersection of Fourteenth and Rowan streets, where three parallel tracks ran east of him and three west of him; none that the plaintiff did not stop or listen when he approached and went upon what is called the "bridge" track, on which the freight train was moving; nor any that he had seen that train when north of Portland avenue and moving southward; nor any that he saw certain persons get off of it and go with lanterns over towards the "Dinkey" train; nor any that he was perfectly well informed as to the entire local situation, and knew its dangers; nor any that he, like those upon the freight train or engine and tender, were all employés of the defendant. The last proposition, indeed, is in no way denied, though it is insisted that the plaintiff's duties. as an employé had ceased for the day, just before the accident, and that he was then off duty and on his way home, and that these facts take his case out of the usual rule as to fellow servants. His statements bearing upon this subject have been copied from the stenographer's notes, and are as follows:

Extract from direct examination of O'Neil: "Q. By Mr. Smith: What were your hours of labor there? A. From 6 o'clock in the morning until 6 o'clock in the evening. Q. Did you leave your work there before your time was up in the evening there on that day? A. No, sir; I never did leave there until the dinkey at 6 o'clock; got orders from the detective there not to leave until the six o'clock dinkey would go out. Q. How do you know you left after 6 o'clock on this 28th of November, 1900? How do you know it was after 6 o'clock? What were you governed by? A. I was governed by the dinkey, and by the bell that I heard ring, and whistles.. Q. What bell was that you speak of? A. St. Patrick's bell; it rings at 6 o'clock every night of the year. Q. You were governed by that bell and the going out of the dinkey? A. I was governed by the dinkey; I could not leave until the dinkey should go out. * * * Q. By Mr. Gibson: You went on duty at 6 o'clock in the morning, and you had remained on duty until the 6 o'clock dinkey went out, did you? A. Yes, sir. Q. If it was delayed, you had to stay there, didn't you? A. Yes, sir; I had to stay there; I would be discharged if I would go home. Q. This evening you say you waited until the 6 o'clock dinkey had crossed north over Rowan street? A. Yes, sir. Q. Then you put out your lamp? A. Yes, sir. * * * Q. As long as you are there on the premises, you are supposed to be on duty, are you not? A. Certainly. Q. Until you get clear off it is your duty to look out for all trains that come there, is it not? A. No, sir; I was done at 6 o'clock. There was no flagman there at night. Q. But if, right at 6 o'clock, before you got off the premises, you saw a train coming and a wagon in the way, do you do anything, or not? A. Certainly, I will; I won't get anybody hurt. Q. As long as you are on the premises, then, you undertake to flag trains, look out for them, do you? A. Yes, sir."

The plaintiff is entitled to have these statements construed favorably to him in disposing of the pending motion. It will therefore be assumed that just before the accident he had practically finished his duties for the day, and had just started home, and had gotten a very short distance on his way when he was struck.

I have made as much effort as has been within my power to ascertain the settled rules of law applicable to the state of facts indicated. One rule of law (unless under conditions not involved in this case) is that the servant or employé, when entering upon an employment such as the plaintiff had in this case, impliedly agrees to assume all of the ordinary risks of his employment; and from this and other considerations it follows that his employer is not responsible for any injury to him which results from the negligence of such co-employés as are called fellow servants. One of the ordinary risks incurred and involved, where the employment is such as plaintiff's was, must necessarily relate to the dangers attendant upon the servant's going to and departing from the exact place among the tracks and at the crossing where he performs the duty of watching and flagging trains. He takes upon himself responsibility for the ordinary hazards and risks of getting to his work over the tracks to the flagging station, and, equally necessarily, those of going over those tracks, after the day's work is done, from the flagging station to a point of safety beyond the tracks. He must necessarily go to his work, and, equally necessarily, he must leave it when the day's work is done, and I think the rule must be that the assumption of risk begins when he gets to the defendant's premises for the purpose of going to work, and must end when he has left those premises on returning home. In other words, the very nature of plaintiff's employment as flagman necessarily involved and included ingress over defendant's tracks to the point where plaintiff's duties were to be performed, and also egress therefrom over the same tracks after the day's work ended. As there was no possible avoidance of this, it must follow that, in the contemplation of the parties, they were both included, and the plaintiff must for that reason be regarded as having assumed all the ordinary risks attendant upon his attempts to get over the tracks to the place where he worked, and over the same tracks to a place of safety after his work ceased, and such assumption must therefore be regarded as first taking place when ingress began, and as having terminated when egress was completed. When he, on his way home, has entirely left the premises where his labors were performed, then, and not till then, his situation becomes like that of any other person not an employé. I see no escape from this conclusion upon any reasonable ground consistent with the rules of law referred to.

Upon hurriedly looking into the authorities since we adjourned, I have found that in Fletcher v. B. & P. R. Co., 168 U. S. 135, 18 Sup. Ct. 35, 42 L. Ed. 411, the employé was on the company's premises and train coming to his work, but before he got there was injured by the negligence of his fellow servants. He was not permitted to recover, because of the rule we are discussing. In the case of N. P. R. Co. v. Charless, 162 U. S. 359, 16 Sup. Ct. 848, 40 L. Ed. 999, the plaintiff was injured by employés of the company for which plain-

tiff also worked, and he was allowed to recover, apparently because, at the time the injury was inflicted, he had entirely left the grounds and workshops of the company, and was therefore situated like any outside person. A similar result followed under practically similar circumstances in Orman v. Salvo, 54 C. C. A. 265, 117 Fed. 233. If, while on the master's premises, going to his work, but before he got to it, a servant is regarded as having assumed the ordinary risks attendant upon so going, as held in the Fletcher Case, 168 U. S. 135, 18 Sup. Ct. 35, 42 L. Ed. 411, there seems to be no reason why the same rule should not be applied to a servant who is still on the master's premises, and must of necessity be subjected to the usual hazards until he has left the premises on his way home. The rule seems to cease and change only when the servant has gotten entirely off the master's premises, as in the Charless Case, 162 U. S. 359, 16 Sup. Ct. 848, 40 L. Ed. 999.

When the accident occurred in the case before us, the plaintiff had not entirely nor at all severed his relations with the defendant when he started home after his day's work. He was still an employé, even if not then on duty. Hence his case is not like one where, before he started home, the relation of master and servant had entirely ceased, as, for example, by a discharge by the master or the quitting of the service finally by the servant, in either of which events he would have no fellow servants, and the operation of the doctrine as to assumed risks would cease eo instante, and would not protect the master for a moment afterwards. Such seems to have been the view necessarily taken by the court in the case of Packet Co. v. McCue, 17 Wall. 508, 21 L. Ed. 705. I have, however, found no case meeting the exact situation of the one before us, but I cannot persuade myself, upon the facts shown, that the plaintiff, when injured, was in a position to be exempt from the general rule. To benefit him, there must be a relaxation of the doctrines relating to injuries inflicted by fellow servants and those relating to the risks assumed by the servant, which relaxation it would be more becoming for me to leave to the superior power or liberty of a higher court to make. I therefore conclude, upon the testimony, that the plaintiff's case comes within the established rule that he cannot recover, even if, as he contends, there was negligence upon the part of the defendant's employés. In other words, I consider the rules of law relating to the nonliability of masters to servants for injuries caused by the negligence of fellow servants as embracing a case like this, when fair effect is given to the testimony.

The evidence does not show any contract with the plaintiff to work merely from 6 a. m. to 6 p. m. It is true that ordinarily his labors for the day ceased about 6 p. m., but no contract was shown to prove any hard and fast rule or stipulation that his duties were to cease at precisely that hour. On the day of the accident the actual performance of his work brought him so close up to the duty of looking out for and flagging the train or engine which hurt him, and which he admits having seen after it crossed the bridge and was coming in his direction, as to bring his case up to, if not entirely within, the rules of law relating to contributory negligence. It is undeniably true that

the plaintiff was well acquainted with the locality where he worked, and with its numerous dangers. He seems clearly to show that, as he approached the "bridge" track on which the engine or freight train was coming, he did not stop or listen. Probably he did not even look, though he says it was so dark he could not see the engine, although his own witnesses testify to having seen him at the time and at a much greater distance. If he had stopped and listened, even without looking, it seems unreasonable to suppose that the approach of the train would not have become known to him. Indeed, so close was the engine to him that if he had stopped at all, even if for only a moment, it would have been right in front of him, and have blocked his way before he could have reached the "bridge" track at which he was hurt, and in this way he would have escaped injury. He perfectly well knew the track was there. It was of itself a warning of danger and of its hazards, and he knew, as before stated, that the train had left the bridge and·was coming towards his place of duty. The duty of stopping and of listening rested upon him, and under these circumstances was emphasized by what he knew and ought to have remembered. So that, even if he looked, which we can hardly reasonably suppose was the case, he did not stop and he did not listen. As the proof makes it clear that he could not have reached the track in advance of the engine if he had stopped at all, it appears to be manifest that his failure to stop was not only negligence on his part, but was really the cause of the injury to him. If this be so, I see no grounds for believing that his own negligence did not cause the injury or contribute to it.

The question of whether there was any negligence at all on the part of the defendant or its employés I do not undertake to decide, but have assumed that there was such negligence for the purposes of the pending motion.

Upon the whole case as presented by the testimony, and giving to it what I regard as its full effect, I am of opinion that it cannot reasonably be concluded therefrom that the plaintiff is entitled to a verdict. It may be that upon either of the grounds I have discussed I ought to sustain the defendant's motion. The force of the two combined appears to be irresistible, and the jury will be instructed to find a verdict for the defendant.